

Signed/Docketed
August 12, 2015

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

In re                                    )
                                         )  Case No. 13-30169 MER
EXPERIENT CORPORATION                    )
                                         )  Chapter 11
            Debtor.                      )

## ORDER

"Life imitates art."[1]  The within dispute is reminiscent of *Moby Dick*, where Herman Mellville describes Captain Ahab's self-destructive obsession to destroy a whale that had injured him in the past.[2]  This matter comes before the Court on confirmation of the Second Amended Chapter 11 Plan of Reorganization as amended by the Errata to the Debtor's Second Amended Plan (collectively, the "Second Amended Plan")[3] filed by Debtor-in-Possession Experient Corporation ("Experient"), and the sole objection to confirmation of the Second Amended Plan ("Objection to Confirmation")[4] filed by creditors John T. Randall, James Bateman, Raymond Leonard Randall and Teri Thomson Randall (collectively, the "Randall Creditors").

The Court, having considered the evidence and legal arguments presented, hereby makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) as it involves confirmation of the Second Amended Plan.

---

[1]  Oscar Wilde, THE DECAY OF LYING (1889).

[2]  Herman Melville, MOBY DICK (1851).

[3]  Debtor's Second Amended Plan of Reorganization (Docket No. 226) and Errata to the Debtor's Second Amended Plan (Docket No. 255).

[4]  Randall Creditors' Objection to Confirmation, Docket No. 254.

## BACKGROUND

To describe this small business Chapter 11 case as contentious would be a gross understatement.  The littered docket reflects the ongoing vitriol between the parties, and unfortunately, their respective counsel.  Perhaps this is best illustrated by the parties inability to agree to a single stipulated fact or stipulated exhibit in connection with the confirmation trial.

At the outset, the Court notes much, if not most, of the testimony elicited by creditors' counsel was not relevant to the elements of 11 U.S.C. § 1129 or the credibility of the parties.[5]  This includes the testimony regarding the various failed settlement discussions between the parties in any context, "potential" stock option offers that never actually occurred, pre-petition discussions regarding Experient's value or any alleged company sale proposals, and any facet of the state court litigation.  Burdened with the unenviable task of navigating this sea of inconsistent and irrelevant information, the Court has cobbled together dispositive facts based on the Court's record, the limited relevant testimony provided at trial, and the admitted exhibits.[6]

## A.     The White Whale: Experient's Business and Operating History

William O'Neil ("O'Neil") is an experienced computer programmer in the 9-1-1 software industry.  In April 2002, O'Neil formed and incorporated Experient under Colorado law to build and sell his own 9-1-1 software.  Since its inception, O'Neil has managed Experient and held the title of president.  "Experient integrates non-custom hardware and its own custom designed software for use in the 9-1-1 industry.  The 9-1-1 industry is a unique niche resulting from the juncture of telephony, hardware and specialized software designed to meet the needs of 9-1-1 call centers or PSAPs (Public Safety Access Points)."[7]  Currently, there are over six thousand 9-1-1 call centers in the United States.  Experient has less than 1% of the national market share for this type of business, and maintains software for about twenty-five customers.

---

[5]  Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[6]  *See* Minutes of Proceeding (Docket Nos. 286 and 289).  The Court admitted only the following exhibits at trial: Debtors' Exhibits 1, 2, 4, 5, 13, 14, 15 and 16; and Creditors' Exhibits H, N, T, U, Q, X, Y, Z, AA, CC.

[7]  Lutz Report, Exhibit 5, at p. 5.

Experient's primary source of revenue is product sales. It also provides regular upgrades and servicing to its clients. Experient's software is not patented or copyrighted. Given the nature of the 9-1-1 software industry, technical support and software maintenance is "mission critical".[8] Experient currently has twenty-three month-to-month contracts with existing customers for such ongoing software maintenance and support.[9] These contracts generate annual income of $269,400.00, but after deducting the expenses for hardware maintenance and support personnel, there is an annual net loss of -$19,754.00.

A month after its formation, John Randall ("Randall") loaned seed money to Experient under the terms of a promissory note.[10] In April 2003, Experient hired Geoff Hungerford ("Hungerford") to assist O'Neil with programming and creating source code. Hungerford helped O'Neil to finish writing the first version of Experient's 9-1-1 software, and obtained a 10% equity interest in Experient after reaching certain milestones.

In December 2003, Experient sold and installed its first 9-1-1 system. By September 2004, Experient had sold two more systems, but no other sales were pending. The initial three sales did not generate sufficient revenue to sustain the employment of Hungerford, and shortly thereafter, Hungerford resigned and sold back his 10% ownership interest to Experient for $1,000.00 For the next three years, O'Neil continued to work on the software and tried to make additional sales by himself.

From September 2004 until March 2006, Experient did not sell a single 9-1-1 system. In order to raise additional capital, Experient sold equity shares to two individuals in 2005, Randall's friend, James Bateman ("Bateman"), and Salvatore LaRosa.[11] Bateman purchased his 2.88%

---

[8] *See* Transcript of May 29, 2015, p.43-44.

[9] *See* Exhibit 14, summary of current maintenance and support contracts.

[10] *See* Transcript of May 29, 2015, p.26, lines 4-11. O'Neil testified he is not a guarantor on the loan, and the Court notes the Randall Creditors presented no evidence to this Court of any personal guaranty.

[11] *See* Third Amended Disclosure Statement, at p.8 (Docket No. 184). Salvatore LaRosa purchased a 2.97% interest in Experient. In 2007, Experient sold a 1% interest to Andrew LaRosa, Salvatore LaRosa's father. *See id.*

ownership interest in Experient for $30,000.[12]  Bateman never sold his ownership interest.[13]  Bateman's purchase of 2.88% in 2005 marks the last date when any of the Randall Creditors provided any funds to Experient.

On several occasions between 2002 and 2010, as Experient's operations limped along, Experient and Randall modified the terms surrounding Randall's initial loan, and any subsequent funding from Randall and his family members.[14]  Tracing the agreements and disagreements concerning those transactions was the subject of state court litigation, and no benefit would be served by restating those arguments here.  The bottom line: as of the petition date, Randall held an 18.63% ownership interest in Experient and an unsecured judgment in connection with a promissory note accruing at 18% interest, and the other Randall Creditors asserted various disputed unsecured claims against the estate.

In June 2006, O'Neil recognized the design limitations of Experient's then poorly-documented software,[15] and he approached his friend Robert McCarthy ("McCarthy") to assist Experient.  McCarthy is a full-time airline pilot, with a background in computer science and programming.  He agreed to work as an independent contractor for Experient in his spare time to make the necessary modifications and updates to the software source code.[16]

---

[12]  Third Amended Disclosure Statement, at p.8; Transcript of June 3, 2015, p.260, lines 4-9.

[13]  On September 29, 2009, Bateman disclosed a 3% ownership interest in Experient with "no cash value" in his personal Chapter 7 bankruptcy filing.  Exhibit 15, Case No. 09-30430-EEB, Bateman's Schedule B, p.16.  In his Amended Schedule B filed on March 16, 2010, Bateman again disclosed a 3% ownership in Experient with a $0 value.  Exhibit 16, Case No. 09-30430-EEB, Bateman's Amended Schedule B, p.8.  However, Bateman testified he was not a shareholder of Experient at the confirmation hearing, casting significant doubt on his credibility.

[14]  The Court received no evidence regarding those loan modifications and transactions with Randall and his family, and in any event, the Court finds those transactions are immaterial to confirmation of the Second Amended Plan.  The basis and amounts of the Randall Creditors' disputed claims will be heard in connection with Experient's pending objections to those claims.

[15]  The poor documentation of Experient's then existing software source code was attributed to Hungerford.

[16]  *See* Transcript of June 3, 2015, p.201, lines 23-25 through p.202, lines 1-24.

After executing a Software Contractor Agreement with Experient,[17] McCarthy took the lead on writing new 9-1-1 software code for Experient.[18]

By 2008, the software code was re-written, but Experient was still struggling financially.  Before Experient could release its new software, the accompanying hardware sold as a package with Experient's software became obsolete.  The switch from an analog system to a digital voiceover IP system negated all of McCarthy's recoding between 2006 and 2008.[19]  Thus, O'Neil and McCarthy went back to the drawing board, and again began writing new software source code for Experient.  McCarthy fully documented the most recent version of software source code between 2008 and 2011.[20]

Between 2009 and 2011, the relationship between O'Neil and Randall soured, culminating in Randall commencing a state court action against Experient and O'Neil around April 2011.  The state court dismissed Randall's fraud and breach of fiduciary duty claims.  However, following a trial in November 2013, the jury entered judgment in favor of Randall and against Experient and O'Neil in the total amount of $320,000.00 for amounts owed under the promissory note.[21]  Experient appealed the jury's award of $320,000.00 to the Colorado Court of Appeals, and the appeal is pending.

Despite the time and resources spent on the litigation, O'Neil and McCarthy continued to work on Experient's new 9-1-1 software and focused on making new sales.  To make matters worse, Experient "had to re-engineer the code for a free switch PBX instead of the asterisk-based PBX, and it was time-critical.  At that time, Experient did not have the resources to fully document the code because of time and cost battling in the [state

---

[17]  Software Contractor Agreement between McCarthy and Experient dated July 1, 2006, Exhibit T.

[18]  *Id.*

[19]  *Id.* at p. 202, lines 7-11.

[20]  Transcript of June 3, 2015, p.204, lines 9-12.  McCarthy testified the source code he wrote after Hungerford resigned was fully documented until the state court litigation began in 2011.  The source code created by McCarthy was only partially documented thereafter.

[21]  The jury further found O'Neil had not breached any fiduciary duty.

court litigation].”[22]  Despite everything else going on from 2011 through 2013, McCarthy and O'Neil finished and released the new software.

In the summer of 2013, Experient finally paid McCarthy $27,000 of accrued independent contractor earnings, the first he had received since he started working with the company.[23]  According to O'Neil, by the end of 2013, Experient had nearly tripled its customer base and quadrupled its number of 9-1-1 sites.  However, the state court litigation drained Experient's limited resources, and only fourteen days after entry of Randall's judgment, on December 9, 2013 ("Petition Date"), Experient filed for Chapter 11 bankruptcy protection as a small business debtor.

## B.  The Continued Pursuit of the White Whale: Experient's Chapter 11 Case

As of the Petition Date, the ownership of Experient was as follows: O'Neil 74.523%; Randall 18.63%; Bateman 2.88%; Salvatore Larosa 2.967%; and Andrew Larosa 1.0%.[24]  O'Neil is directly involved in managing Experient, and the remaining owners are passive investors.

With respect to McCarthy, immediately before the Petition Date, Experient and McCarthy entered into a software license agreement,[25] which allows McCarthy to maintain, repair and improve Experient's software for a period of five years.[26]

---

[22]  *See* Transcript of June 3, 2015, p.232, lines 6-17 (McCarthy testified Experient "could have hired two or three more people with the money that we spent. And [the code] would be documented if that had not happened. It's just unfortunate that this has happened.").  McCarthy also testified that after the state court litigation began, the source code was only documented to the extent McCarthy can understand it, and while "[i]t would not be impossible . . . it would be very difficult" for another programmer to understand it. Transcript of June 3, 2015, p.205, lines 8-25.

[23]  Transcript of June 3, 2015, p.220, lines 13-24.

[24]  *See* List of Equity Security Holders (Docket No. 4); *see also* Exhibit 5, p. 5 (relying on Experient's 2012 tax returns).

[25]  Schedule G (Docket No. 30).  The license agreement was not offered or admitted into evidence.  Other than O'Neil's testimony regarding the existence and disclosure of the agreement, the only evidence before the Court regarding the substance of the license agreement is McCarthy's testimony.

[26]  Transcript of June 3, 2015, p.219, lines 18-25.

Initially, the Court was concerned with the timing of this agreement. However, McCarthy explained the purpose of the non-exclusive license agreement was to provide continuity and continued support for the software in the event the within case was converted to a case under Chapter 7 of the Bankruptcy Code:

> Basically, our software on our systems support approximately 13 and a half million people, and it's very important--I mean it's vital that that's--that continuity of support not stop, because we've got to keep those systems running. And that was the primary purpose of that license agreement.[27]

This explanation makes logical sense.  According to McCarthy, the license agreement was put into place to protect customers and their citizens in the event of Chapter 7, and to ensure McCarthy, and not a third party, could continue working for Experient.  No evidence was presented to refute this testimony.

Early in this bankruptcy case, to address any concerns as to alleged mismanagement, Experient filed a motion to appoint a Chapter 11 examiner for the sole purpose of reviewing all transactions between Experient and O'Neil.[28]  On February 25, 2014, the Court entered an order granting the motion,[29] and the Office of the United States Trustee ("UST") selected Tom Connolly ("Connolly") as the independent examiner.[30]  On July 22, 2014, Connolly filed his Examiner's Report.[31]  After a thorough review of the company financials and transactions between O'Neil and Experient, Connolly determined "O'Neil was a net debtor to Experient on the Petition Date, not the other way around."[32]

---

[27]  Transcript of June 3, 2015, at p.207, lines 8-14.

[28]  Experient's Motion to Appoint Examiner (Docket No. 53).

[29]  Order Granting Experient's Motion to Appoint Examiner (Docket No. 68).

[30]  UST's Motion to Appoint Connolly as Examiner (Docket No. 76) and Order Appointing Connolly as Examiner (Docket No. 78).  The Order Appointing the Examiner was later amended on March 18, 2014, to clarify Connolly was appointed only "for the purpose of examining the transactions between the Debtor and Mr. William O'Neil."  Amended Order Appointing the Examiner (Docket No. 87).

[31]  Exhibit CC, Examiner's Report (Docket No. 121).

[32]  *Id.* at p.7.

As it relates to proposing a confirmable Chapter 11 plan, Connolly concluded as follows:

> A Chapter 11 Plan for Experient should be based on the assumption that O'Neil's secured claim should be set aside either as having been already paid or as having been created with a fraudulent intent and on the assumption that O'Neil's back pay claim should be reduced as partially unenforceable against Experient on statute of limitation grounds or as having been paid by offset against the loans to O'Neil that were on Experient's books on the Petition Date.
>
> The Plan must then be based on a clear understanding of what O'Neil is claiming as salary due him in this Chapter 11 and what he will be claiming for salaries going forward. The plan process and understanding of Experient's financial condition would be greatly facilitated, if Experient would, for Disclosure Statement purposes, prepare its financial statements on the accrual basis. Without full accrual of revenue and expenses, it will be impossible to judge the continued viability of Experient or the feasibility of any proposed Plan.
>
> If Experient can be profitable on a full accrual basis with reasonable, clearly stated salaries to its employees, then a feasible Plan could be framed. From the schedules it does not appear that trade creditors are a problem and Experient has no bank debt. The resulting Chapter 11 Plan should then balance the enterprise value of the reorganized (and now presumably profitable) Experient fairly between O'Neil and the original cash investors based upon their original cash investment in the company.[33]

After Connolly was appointed, the UST filed a Motion to Dismiss, asserting cause existed for dismissal under §§ 1112(b)(4)(A) and (b)(4)(H).[34]  Experient objected.[35]  Ultimately, Experient and the UST reached a stipulation resolving the Motion to Dismiss and agreeing "in the event **Debtor's Plan or any amended Plan** is not confirmed by the Court,

---

[33]  *Id.* at p.7-8.

[34]  UST's Motion to Dismiss (Docket No. 110).

[35]  Experient's Objection to Motion to Dismiss (Docket No. 118).

Debtor shall convert its case to a Chapter 7 case."[36]  On November 24, 2014, the Court entered an Order Approving the Stipulation.[37]

The terms of the Order and the related Stipulation between the UST and Experient are unambiguous, and the Randall Creditors are not parties to the Stipulation.  The Court expressly finds the Order and Stipulation remain in full force and effect, and if the Second Amended Plan is not confirmed, Experient must convert this case to Chapter 7 by agreement with the UST.[38] Dismissal is not an option for Experient, and neither is proposing another Chapter 11 plan.

## C.  Adrift at Sea: Post-Petition Disputes Between Experient and the Randall Creditors

Less than two months after the Petition Date, on January 30, 2014, the Court granted relief from stay permitting both Experient and Randall proceed with the pending appeal in state court.  On April 7, 2014, despite having already obtained relief from stay, Randall filed a second motion for

---

[36]  Stipulation Resolving Motion to Dismiss (Docket No. 167), at ¶ 6 (emphasis added).

[37]  Order Approving Stipulation (Docket No. 168).

[38]  With respect to the Stipulation, Ms. Secor, counsel for the Randall Creditors, argued in her closing:

> To start with I do not believe that it is a requirement that this is an all or nothing situation. We are not necessarily in Chapter 7 or have this plan approved. While there was a stipulation with the trustee at one time for a plan in place at that time that plan has been rejected, a subsequent plan was proposed by the debtor and then this plan was proposed. I would submit that stipulation is not in existence anymore and if we consulted with the trustee we might have a different result.

Transcript of June 3, 2015, p.339, lines 10-18. However, there was no evidence presented, and no evidence anywhere in the Court's record, supporting this argument.  Rather, the Stipulation clearly contemplated and expressly covered "any amended" plan filed by Experient.  The Stipulation was approved by the Court, and was never altered, amended or withdrawn. Furthermore, the UST did not object to confirmation of the Second Amended Plan, nor was any representative from the UST called as a witness at the confirmation hearing.  Thus, any suggestion of or reference to hearsay communications between Ms. Secor and the UST, to the extent they even exist, have never been presented to this Court and cannot be considered for the purposes of this opinion.

relief from stay, which was also granted on April 30, 2014, to allow the parties to proceed with the pending appeal "through conclusion."

On November 14, 2014, Experient filed four Motions to Disallow Claims,[39] pertaining to the claims asserted by the Randall Creditors and Sue Ann Randall.  These creditors filed a single combined objection to the Motions to Disallow on December 12, 2014.[40]  A scheduling conference to set an evidentiary hearing on the Motions to Disallow Claims is currently scheduled on August 18, 2015.  The merits of the claims objections will be heard in due course.

Experient also commenced two adversary proceedings against Randall. The first proceeding was dismissed by stipulation after the parties agreed *inter alia* Randall did not have secured claim against Experient.[41]  In the second adversary proceeding, Experient seeks subordination of Randall's claim, designation of his vote rejecting confirmation of the plan for bad faith, and disallowance of Randall's unsecured claim.[42]  After Randall filed his answer, the Court put the parties on a discovery schedule and set various other deadlines, including a pre-trial conference scheduled for early 2016.[43]

## D.    The Final Chase: Experient's Plans of Reorganization

As a preface, the Court notes the UST did not file a single objection to confirmation of any plans proposed by Experient.  All objections were filed by the Randall Creditors in different combinations, and other related creditors as outlined below.  Moreover, the Court stresses **the facts surrounding the two failed settlements concerning two previous plans are irrelevant to whether the proposed Second Amended Plan should be confirmed.**  However, to the extent the Randall Creditors argued

---

[39]  *See* Motions to Disallow James Bateman's Claim No. 13-1, Raymond Randall's Claim No. 8-1, Sue Ann Randall's Claim No. Claim No. 12-1, and Teri Randall's Claim No. 2-1 (Docket Nos. 152, 154, 156 and 158).

[40]  Objection to Motions to Disallow Claims (Docket No. 173).

[41]  *See* Stipulated Motion to Dismiss Adversary Proceeding, Adv. Proc. No. 14-01581-MER (Docket No. 23).

[42]  *See* Complaint, Adv. Proc. No. 14-01582-MER (Docket No. 1).

[43]  Scheduling Order, Adv. Proc. No. 14-01582-MER (Docket No. 14).

previous plans and settlements have any bearing on whether the Second Amended Plan was proposed in good faith, the Court revisits the previous plans and objections thereto for a complete record.

Experient filed its original Disclosure Statement on September 26, 2014, two months after the Examiner's Report was filed.  No objections to the adequacy of the original Disclosure Statement were filed, and the Court conditionally approved the Disclosure Statement and set deadlines for confirmation.  On October 6, 2014, Experient filed its first Plan of Reorganization.[44]  Randall filed an objection, and a second objection was filed by Bateman, along with Sue Ann Randall, Randall K. Wilde and Nancy R. Wilde Trust.  By agreement of the parties, the original confirmation hearing was rescheduled from November 18, 2014 to January 12, 2015.

As a result of negotiations held prior to the start of the continued confirmation hearing, the parties reached a settlement in principle and read the anticipated terms of the settlement on the record.  On February 9, 2015, Experient filed its Amended Plan of Reorganization and Amended Disclosure Statement, incorporating the terms of the apparent settlement.[45]  For the second time, no objections to the adequacy of the Amended Disclosure Statement were filed, and the Court approved the same.  Evidently, the alleged settlement was not consummated, and Randall filed an objection to confirmation of the Amended Plan of Reorganization on March 9, 2015.  The objection purported to be joined by Sue Ann Randall, Raymond Randall, the Wilde Trust, and Bateman.  However, at that time, Sue Ann Randall, the Wilde Trust, and Bateman were not represented by Ms. Secor, and had different counsel, Mr. Buechler, who did not sign the objection on behalf of his clients.

On March 11, 2015, Experient filed a Motion to Enforce Settlement Agreement and Motion for Sanctions.  On March 13, 2015, to the extent they

---

[44]  The first Chapter 11 plan was filed within the deadlines set forth in § 1121(e)(2), thereby triggering the requirement in 11 U.S.C. § 1129(e) that a plan be confirmed within forty-five days after the plan is filed.  The Court notes that throughout Experient's case, Experient timely complied with all §§ 1121(e)(2) and § 1129(e) deadlines as extended by this Court.  The current deadline to confirm the Second Amended Plan expires August 21, 2015.

[45]  Docket Nos. 183 and 184.  On February 18, 2015, Experient filed an Errata to the Amended Plan of Reorganization and Amended Disclosure Statement (Docket No. 186).

ever objected, Sue Ann Randall, Randall K. Wilde and the Wilde Trust, through their counsel Mr. Buechler, filed a notice withdrawing any objection they purportedly had to confirmation of the Amended Plan of Reorganization.[46]  After the procedural haze dissipated, the only parties objecting to confirmation of the Amended Plan were the Randall Creditors.

At the hearing held March 16, 2015, the Court denied Experient's request to enforce the settlement terms read onto the record, but awarded sanctions against the objecting creditors.[47]  At the same hearing, Experient and the Randall Creditors stated on the record they had reached yet another settlement in principle, and read the new anticipated terms of the settlement on the record.  Because of the history between these parties and the first failed settlement, the Court ordered the parties to file a written stipulation incorporating all terms of any settlement, along with a supplement to the proposed Amended Plan.  The Court also granted Mr. Buechler's Motion to Withdraw as Counsel for Bateman, and Bateman retained Ms. Secor as his counsel.

For the second time, the settlement was never consummated.  On March 27, 2015, the Debtor filed its Second Amended Plan and a Second Amended Disclosure Statement.[48]  With the exception of increased administrative claims, the Second Amended Plan was virtually identical to the original plan filed back in October 2014.

Then, for the first time, the Randall Creditors filed an objection to the adequacy of the Second Amended Disclosure Statement.  In order to resolve the objection at the disclosure statement hearing, the Court ordered Experient to file a Third Amended Disclosure Statement containing a revised "basic" history of the ongoing state court litigation and attaching certain profit and loss statement summaries.[49]  Two days later, Experient filed its

---

[46]  Docket No. 204.

[47]  *See* Minutes of Proceedings dated March 16, 2015 (Docket No. 213).  On March 19, 2015, Experient timely filed its Affidavit of Costs for $1,180.  The Objecting Creditors paid this amount, but only after the Court ordered them to do so.  *See* Order (Docket No. 256).

[48]  Docket Nos. 226 and 227.

[49]  *See* Minutes of Proceeding dated April 6, 2015 (Docket No. 237).

Third Amended Disclosure Statement containing the required amendments.[50] After independently reviewing the Third Amended Disclosure Statement, the Court entered an Order approving the Third Amended Disclosure Statement as final, and set all other confirmation deadlines.[51]  The Randall Creditors filed the lone objection to confirmation of the Second Amended Plan.

On June 3, 2015, the Court concluded a two-day trial regarding confirmation of the Second Amended Plan.  This trial was the **first** opportunity Experient and the Randall Creditors had in this case to present evidence regarding confirmation.  Following closing arguments, the Court took this matter under advisement and informed the parties the Court would issue a written opinion.

About two weeks after trial concluded, the Randall Creditors filed a Motion to Set Aside Order Approving the Stipulation Between Experient and the UST, and the Debtor filed a Motion to Strike the Motion to Set Aside.[52] The same day, the Randall Creditors filed a Response to Motion to Strike, and a Motion for Leave to File Alternative Chapter 11 Plan of Reorganization.[53]  Noting the premature and inappropriate nature of these pleadings filed after trial, the Court entered an order holding all of these pleadings in abeyance pending this ruling on confirmation.[54]  Within an hour after that Order was docketed, the Randall Creditors filed a Motion to Appoint a Chapter 11 Trustee.[55]  Again, the Court entered an order holding the Motion to Appoint a Trustee in abeyance pending this ruling.  Even under the most liberal procedural standards, those post-trial pleadings cannot be considered part of the record for confirmation.  Therefore, none of those pleadings filed after trial were considered for the purposes of confirmation.

---

[50]  Docket No. 240.

[51]  Order Approving Third Amended Disclosure Statement (Docket No. 242).

[52]  Docket Nos. 298 and 300.

[53]  Docket Nos. 301 and 303.

[54]  Order (Docket No. 304).

[55]  Docket No. 305.

### E.  Fates' Lieutenant: Witness Credibility

In light of the factual inconsistencies and disagreements between witnesses, and the misinterpretation of testimony during questioning and closing arguments, credibility was an important consideration in determining this matter.  During trial, the Court heard testimony from five witnesses: William O'Neil, Shari Lutz (admitted as an expert in business valuation), Robert McCarthy, James Bateman, and John Randall.  At the outset, the Court finds Mr. O'Neil, Ms. Lutz, and Mr. McCarthy are credible and their testimony is reliable.  In addition, the Court notes the sound observations and well-supported conclusions detailed in Ms. Lutz's expert report concerning the valuation of Experient.[56]

The Court further finds James Bateman was not credible and his testimony was speculative, inconsistent and contrary to other reliable evidence.  Mr. Bateman was uncertain whether he was an owner of Experient as of the Petition Date, and his testimony did not apply to any specific time line over a ten year period, rendering his recollection of events entirely unreliable.

As a general observation, the Court finds Randall was not a credible witness with respect to confirmation issues.  It was clear the years of litigation against Experient and Mr. O'Neil have taken their toll.  The Court finds Randall's testimony was blindly biased by his dissatisfaction that the state court judgment may not be paid in full (although this is a common occurrence for unsecured creditors), and by his apparent festering dislike of O'Neil.  While on the stand, Randall was unable to let go of the past financial status of Experient and the state court litigation, and to focus on current realities.  Further, his non-expert valuation of Experient was highly questionable and based on mere conjecture.

### DISCUSSION

### A.    Overview of Second Amended Plan

Experient's Second Amended Plan is a straightforward liquidating plan. The Second Amended Plan provides, under the terms of an Asset Purchase

---

[56]  *See generally* Lutz Report, Exhibit 5.

Agreement dated September 25, 2014 ("APA"),[57] Experient shall sell all assets ("Purchased Assets"), except cash on hand, accounts receivable, avoidance claims, and legal claims in existence as of the closing (collectively, the "Remaining Assets"), to McCarthy in exchange for $50,000.00 cash and McCarthy's waiver of his unsecured claim in the amount of $375,875.00 Experient will continue operations until the APA closing occurs, at which time, Experient will cease all business operations.  The APA requires the closing to take place within three days after entry of a final and non-appealable order confirming the Second Amended Plan.[58]

The Second Amended Plan specifically provides the terms of the APA are subject to any higher or better offers.[59]  The deadline to submit any such competing offers was May 1, 2015 (also the deadline to file objections to confirmation).  At trial, O'Neil testified no other offers of any kind were received by Experient during the pendency of this Chapter 11 case.[60]  Thus, the proposed sale of the Purchased Assets to McCarthy is the only firm offer for consideration.

Further, the Second Amended Plan provides, upon confirmation, all assets will be transferred to the Reorganized Debtor, which will in turn transfer the Purchased Assets to McCarthy at closing.  The Reorganized Debtor will retain any Remaining Assets, plus the $50,000.00 proceeds from the sale of the Purchased Assets, less any allowed Chapter 11 administrative expenses and plan trustee expenses - the Second Amended Plan defines this

---

[57]  The Asset Purchase Agreement was attached as Exhibit 1 to Second Amended Plan (Docket No. 226).  This is the same Asset Purchase Agreement attached to Experient's original plan of reorganization filed back in October 2014.  *See* Docket No. 136.

[58]  Asset Purchase Agreement, Exhibit 1 to Second Amended Plan (Docket 226), at ¶ 4.2.  The parties may extend the closing date by mutual agreement, but no later than ten days after entry on the final and non-appealable confirmation order.  *Id.*

[59]  Second Amended Plan, at p.4, ¶ 1.12 (defining the term "Higher and Better Offer").

[60]  Transcript of May 29, 2015, p.44, lines 4-22.  Further, both Randall and Bateman testified they were aware of this right, and did not make any offers to purchase the Purchased Assets.  Transcript of June 3, 2015, p.204, lines 23-25 through p.206, lines 1-6; and p.302, lines 15-25 through p.303, lines 1-25.

amount as the "Net Proceeds."[61]  Experient estimates Net Proceeds will be approximately $112,000.00[62]  In addition, upon confirmation, Experient proposes retaining David Wadsworth to serve as the "Plan Trustee" charged with administering the Net Proceeds, pursuing any legal claims, and paying all unsecured creditors holding allowed claims a *pro rata* share of the Net Proceeds.[63]

In summary, the Second Amended Plan designates the following four classes:

Class 1:  Any claim of O'Neil.

Class 2:  Allowed general unsecured claims.

Class 3:  Allowed unsecured claim of McCarthy.

Class 4:  Holders of pre-petition equity interests in Experient.

With respect to the O'Neil's claim, the Second Amended Plan provides for three possible treatments:  the first scenario assumes O'Neil has an allowed secured claim; the second scenario assumes an allowed unsecured claim; and the third scenario assumes O'Neil has no allowed secured or unsecured claim.  However, only the third scenario applies as a result of the conclusions of the Examiner's Report whereby Connolly determined O'Neil owed Experient money, "not the other way around."[64]  Thus, under the terms of the Second Amended Plan, O'Neil's claim must be treated as follows:

> To the extent that the claim of the Class 1 creditor is not allowed as either an allowed secured claim or an allowed unsecured claim, **the Class 1 creditor shall receive no payment under the Plan on account of his claim. Provided, however, if this Plan is confirmed, the Class 1 creditor has agreed to subordinate**

---

[61]  Second Amended Plan, at p.5, ¶ 1.25.

[62]  Third Amended Disclosure Statement, at p.7.

[63]  *See* Second Amended Plan, at p.5, ¶ 1.28, and p.12-15.

[64]  Ex CC, Examiner's Report, at p.7.

**his claims to all other allowed claims and to release his security interest.**  However, he reserves the right to assert the claim amounts as an offset to any claim the Estate may assert against him.

**The foregoing notwithstanding, the Class 1 creditor shall not be paid on either his secured or unsecured claim until the Plan Trustee authorizes such payment.**[65]

Therefore, based on a fair reading of the Examiner's Report along with the Second Amended Plan, plus O'Neil's testimony at trial, the Court finds O'Neil has waived any claim against Experient and is not entitled to a distribution under the Second Amended Plan.  Even if he could, any distribution would be at the discretion of the Plan Trustee.  Moreover, O'Neil testified if the Second Amended Plan was confirmed, any claim he has against Experient is waived.[66]  Furthermore, O'Neil acknowledged the Second Amended Plan does not release O'Neil from any liability for any actions brought by the Plan Trustee.[67]  The Court will hold O'Neil to those statements.

In addition, the Second Amended Plan provides McCarthy (Class 3) is waiving his allowed $375,875.00 unsecured claim on two conditions: 1) the Second Amended Plan is confirmed; and 2) the closing under the APA occurs.  Moreover, neither O'Neil nor McCarthy were allowed to vote on confirmation of the Second Amended Plan, creating another safety net for the allowed unsecured creditors' class.

With respect to Class 2 (allowed general unsecured creditors), the Second Amended Plan provides in relevant part as follows:

Class 2 is impaired under the Plan. Class 2 consists of the holders of allowed unsecured claims. The holders of allowed unsecured claims in Class 2 shall be paid a Pro Rata share of the Net Proceeds from the Sale of the Purchased Assets and from the Remaining

---

[65]  Second Amended Plan, at p.9, ¶ 4.1. (emphasis added).

[66]  Transcript of May 29, 2015, at p. 34, lines 6-9; p.87, lines 22-25.

[67]  *Id.* at p.33, line 10-20.

Assets up to the allowed amount of such Class 2 creditors' claims. Payments to the members of Class 2 shall be in full and final satisfaction of the allowed claims of the Class 2 creditors.[68]

With McCarthy and O'Neil excluded from Class 2 and waiving their claims, all Class 2 unsecured creditors holding allowed claims will divide the Net Proceeds on a *pro rata* basis.  Thus, the unsecured creditors will receive a distribution under the plan, negating the Randall Creditors' arguments unsecured creditors would receive nothing.

Further, under the Second Amended Plan, all pre-petition equitable interests in Experient (Class 4) shall be canceled on the effective date, and the holders of such claims will not receive a *pro rata* share of the Net Proceeds unless all other allowed claims are paid in full.  With an estimated $112,000.00 in Net Proceeds, after payment of administrative claims and distributions to Class 2, it appears no funds will be available for any distribution to Class 4.

One final issue regarding the plan overview remains. On May 5, 2015, Experient filed an Errata to the Second Amended Plan.[69]  In his closing argument, Mr. Buechler urged the Court to "ignore" the errata to the Second Amended Plan because the Errata creates an "irreconcilable conflict" between the Second Amended Plan and the APA.[70]  The Court disagrees, and will briefly address this red herring.  The Errata was filed with the Court and is part of the record.  The Errata was served on all creditors and interested parties ten days before ballots for the Second Amended Plan were due. Thus, the Court finds under the circumstances of this case, notice of the Errata to creditors was adequate.

---

[68]  Second Amended Plan, at p.9, ¶ 4.2.

[69]  Errata to the Debtor's Second Amended Plan (Docket No. 255).

[70]  Transcript of June 3, 2015, at p.376, lines 20-25 through p.378, lines 1-10. Although his clients, creditors Sue Ann Randall and the Randall K. Wilde and Nancy R. Wilde Trust, did not file any objection to confirmation of the Second Amended Plan, the Court allowed Mr. Buechler to participate in closing arguments, and the arguments he raised are also addressed herein.  The Court did not allow Mr. Buechler to participate during the presentation of evidence as a matter of fairness to prevent a "trial by ambush."

Moreover, the Errata makes only two changes to the Second Amended Plan:

> On Page 6, Paragraph 1.32, Purchased Assets is corrected to mean "all Assets of the Debtor except cash on hand, accounts receivable, **avoidance claims** and Debtor's legal claims in existence as of the Closing."
>
> On Page 6, Paragraph 1.34, Remaining Assets is corrected to mean "the Debtor's cash on hand, accounts receivable, **avoidance claims** and Debtor's legal claims in existence as of the Closing."[71]

The only changes to these paragraphs was the addition of "avoidance claims" in each defined term. At worst, these two changes are redundant because avoidance claims would fall certainly fall under the broader "Debtor's legal claims" category of carved out assets. Regardless, these changes actually benefit the creditors, clarifying that any avoidance claims (including potential claims against O'Neil) are excluded from the APA sale. This means such claims will ultimately be turned over to the Plan Trustee to pursue at his or her discretion, and not sold to McCarthy. In addition, with respect to the alleged "irreconcilable conflict," the APA is completely silent regarding litigation and does not include avoidance claims (or any legal claims) as part of the Purchased Assets. Thus, the Court sees no conflict between the APA and the Second Amended Plan with respect to legal claims.

Although the terms are clear as to property being sold and property excluded from the sale, if a dispute arises in the future, the Second Amended Plan provides this Court shall retain and have exclusive jurisdiction "[t]o consider any modifications of the Plan, remedy any defect or omission or reconcile any inconsistency in any Order of the Bankruptcy Court, including the Confirmation Order;" "[t]o determine all controversies, suits and disputes that may arise in connection with or interpretation, enforcement or consummation of the Plan;" and "[t]o resolve any pending disputes regarding the Debtor's interest in its Assets[.]"[72] The reservation of

---

[71] Errata to Second Amended Plan (Docket No. 255) (emphasis added). According to the Certificate of Service attached to the Errata, the Errata was served on all creditors on May 5, 2015, ten days before ballots on the Second Amended Plan were due.

[72] Second Amended Plan, at p.18, ¶ 8.3(a)(5), (6) and (8).

jurisdiction with this Court is yet another safety net for creditors.  Therefore, the Court takes judicial notice of the Errata to the Second Amended Plan, and hereby finds the Second Amended Plan is deemed amended *vis-a-vis* the Errata for all purposes, including but not limited to confirmation.

## B.   Requirements for Confirmation

To be confirmed, the Second Amended Plan must comply with each requirement of 11 U.S.C. § 1129(a).[73]  "The proponent of a plan must demonstrate compliance by a preponderance of the evidence."[74]  Based on the evidence presented at the confirmation hearing, the Court finds Experient established all applicable elements of § 1129(a) through the testimony of its president, O'Neil.[75]

The Randall Creditors' Objection raises a myriad of different objections to confirmation of the Second Amended Plan.  However, at trial, the Randall Creditors focused their presentation of evidence and arguments on only four of those issues: 1) whether the plan was proposed good faith pursuant to § 1129(a)(3); 2) whether the plan complies with the best-interest-of-creditors test under § 1129(a)(7); 3) whether the plan complies with the fair and equitable test or violates the absolute priority rule under § 1129(b)(1) and (2); and 4) whether the plan is feasible under § 1129(a)(11).  After reviewing the record, the Court finds no relevant evidence supporting the Randall Creditors' remaining objections raised in the Objection to Confirmation were presented at trial and they are therefore denied.

Before reaching the four primary objections, the Court shall address three other threshold issues: 1) the valuation of Experient; 2) whether the Court should count and estimate the disputed claims of the Randall Creditors and Sue Ann Randall for plan voting purposes; and 3) whether McCarthy is a non-statutory insider of Experient.

### 1.   *Experient's Current Value*

---

[73]  *In re Paige*, 685 F.3d 1160, 1177 (10th Cir. 2012).

[74]  *Id.* (citing *Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993)).

[75]  *See* Transcript of May 29, 2015, p.46, line 14 through p.49, line 11.

At the confirmation hearing Ms. Lutz, admitted as an expert in business valuation, testified with respect to four different valuation methods she applied to Experient, including capitalized after-tax earnings, relief from royalty, recurring revenue and discounted future earnings.  Based on her review of Experient's financials, and in employing each method, she reached the same result - a zero fair market value for Experient.[76]  Ms. Lutz explained Experient's historical sales trends provide no basis for projections of future earnings,[77] and a market approach was inappropriate for valuing Experient because there is not any comparable business in the market similar to Experient that could provide reliable information.[78]

Pursuant to Ms. Lutz's admitted expert report and her testimony explaining certain aspects of her valuation, the Court finds Experient conclusively established the current fair market value of Experient is $0.  This finding is particularly significant given the $50,000.00 purchase price under the terms of the APA and the Second Amended Plan.

The Randall Creditors offered no rebuttal expert, and presented only lay testimony from Randall and Bateman regarding value.  Bateman's testimony regarding "gross income," "gross profit" and "net profits if you removed salaries" demonstrate his lack of understanding of business operations and valuation.[79]  Randall's testimony concerning value was equally unpersuasive.[80]  Randall testified Experient is "worth a lot.  It's a valuable asset.  $50,000 isn't close to being a fair price for that."[81]  However, when asked whether he believed there are any potential buyers in the market who would be interested in buying Experient, Randall replied,

---

[76]   *See* Exhibit 5, Schedule 10 (summarizing the result of these four approaches using Experient's actual 2014 financial records, not projections).

[77]   *See* Transcript of May 29, 2015, p.158-159.

[78]   Transcript of May 29, 2015, p.186.

[79]   *See* Transcript of June 3, 2015, p.261, line 19 through p.262, line 8.

[80]   *See* Transcript of June 3, 2015, p.294-295.

[81]   Transcript of June 3, 2015, p.295, lines 1-4.

"I'm unfamiliar with anybody that would be in that kind of a market, so I really can't answer. I'm sorry."[82]

In summary, the Court finds the expert report and Ms. Lutz demonstrated the fair market value of Experient is $0.

## 2.   *Voting and Claims Estimation*

The allowance or disallowance of a claim, and estimating claims for the limited purpose of voting are two distinct issues.  The Court will address both issues, but the Court stresses the ultimate decision to allow or disallow claims will follow its own path in accordance with §§ 501 and 502.  Any final determination on the allowance or disallowance of the disputed claims is reserved for an upcoming evidentiary hearing.

### a.   Allowed Claims are Entitled to Vote

Section 1126(a) of the Bankruptcy Code provides only "allowed" claims may vote to accept or reject a Chapter 11 plan.[83]  "Once a proof of claim has been filed under § 501, the claim 'is deemed allowed, unless a party in interest objects.'"[84]  If a party in interest files an objection raising at least one substantive objection to a claim under § 502(b),[85] "the court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount . . . ."[86]  In addition, § 502(c) provides the Court may estimate any contingent or unliquidated claim, if the fixing or liquidation of that claim in another forum would unduly delay the administration of the case.[87]

---

[82]   Transcript of June 3, 2015, p.293, lines 18-24.

[83]   11 U.S.C. § 1126(a).

[84]   *In re Richter*, 478 B.R. 30, 40 (Bankr. D. Colo. 2012) (quoting § 502(a)).

[85]   *See id.* at 45-49.

[86]   § 502(b).

[87]   § 502(c).

Here, Randall, Bateman, Raymond Randall, Sue Ann Randall, and Teri Randall filed proofs of claim.  Experient objected to four of these claims, and commenced an adversary proceeding seeking, *inter alia*, to disallow Randall's claim.  The adversary proceeding and the four objections to claims are still pending.  By operation of § 502(a) and (b) and the applicable shifting burdens of proof,[88] those five claims are not "allowed" claims until after a final determination is made following an evidentiary hearing.  Thus, Experient was correct to exclude the correlating rejecting votes in its Class 2 voting analysis.

In addition, the Second Amended Plan defines "allowed claim" as follows:

> [A] claim (a) in respect of which a Proof of Claim has been timely filed with the Court within the applicable period of limitation fixed by Bankruptcy Rule 3003 or (b) scheduled in the list of creditors prepared and filed with the Court by the Debtors pursuant to Bankruptcy Rules 1007 and 3003, and not listed as disputed, contingent or unliquidated as to amount, in either case as to which no objection to the allowance thereof has been interposed within any applicable period of limitation pursuant to Bankruptcy Rule 3007 or an Order of the Court, or as to which any such objection has been terminated by an Order or Judgment which is no longer subject to appeal, or certiorari proceeding and as to which no appeal or certiorari proceeding is pending.[89]

Thus, under both the Bankruptcy Code and the terms of the Second Amended Plan, the five claims above cannot be deemed allowed for voting purposes.

---

[88]  *See Richter*, 478 B.R. at 40-41 (discussing the procedure and shifting burden of proof for claims objections).  Based on the Motions to Disallow, it appears some of the claims at issue in this case may not be entitled to a presumption of validity, however, this is a matter that will be addressed in connection with the upcoming evidentiary claims objection hearing.

[89]  Second Amended Plan, at p. 2, ¶ 1.3.

Turning to actual votes and Experient's Ballot Summary,[90] Experient and O'Neil agreed to treat O'Neil's Class 1 claim as one to which Experient has filed an objection as a result of the Examiner's Report.  Thus, O'Neil's claim (to the extent he even has a claim) was not counted for voting purposes.  For McCarthy's Class 3 impaired unsecured claim, McCarthy voted to accept the Second Amended Plan.  Finally, Experient recognized the impaired Class 4 equity holder claims are deemed to have rejected the plan, and are not entitled to vote.[91]

With two non-voting classes, and some disagreement to whether McCarthy is entitled to vote on a claim he is waiving, the tabulation for Class 2 allowed general unsecured creditors is crucial in this case.[92]  With respect to Class 2, the Ballot Summary provides:

| Creditor | Amount | Accepts | Rejects | Objection to Claim Pending |
|---|---|---|---|---|
| Andrew LaRosa | $10,000 | X | | |
| Jesse Elliot | $95,800 | X | | |
| Kenlyn Kolleen | $100 | X | | |
| Kenneth R. Tweedy | $10,000 | X | | |
| Gary F. Albrecht, LLC | $1,801.70 | X | | |
| Phillis Shuldberg | $30,600 | X | | |

---

[90]  Ballot Summary for Second Amended Plan (Docket No. 273).

[91]  The Class 4 equity holder class only consisted of O'Neil and Randall, but likely should have included Bateman, Salvatore LaRosa and Andrew LaRosa as well.  However, this is a moot point for voting purposes because Class 4 was not entitled to vote, and Andrew Larosa's $10,000 vote in Class 2 is so small it has no impact on the end result for Class 2.

[92]  There is no pending objection to McCarthy's claim, and therefore, McCarthy is entitled to vote on his impaired unsecured claim because his claim is allowed.  However, the Randall Creditors assert his claim should not count because he is the named purchaser under the APA.  To the extent there is any merit to the Randall Creditor's argument, the Court finds the issue is moot because Class 2 voted to accept the Second Amended Plan, and McCarthy's Class 3 claim is inferior to Class 2.

| Schafer Thomas Maez, P.C. | $9,983.33 | X | | |
| UniVision, Inc. | $4,500 | X | | |
| Randall K. Wilde & Nancy R. Wilde Trust | $38,279.22 | | X | |
| Raymond Randall | $25,000 | | X | X |
| John T. Randall | $320,000 | | X | X |
| Sue Ann Randall | $25,000 | | X | X |
| Teri T. Randall | $64,605.36 | | X | X |
| James Bateman | $5,100 | | X | X |

Accordingly, Class 2 votes for included nine total votes representing the class of allowed unsecured creditors.  The ballots provide eight votes accepting and one vote rejecting the Second Amended Plan.[93]  The total dollar amount of voting ballots in Class 2 was $201,064.25, with $162,785.03 (81%) in favor and $38,279.22 (19%) against.  Therefore, the Court finds the requirements of § 1126(c) are satisfied.

 b.  Claims Estimation

Claims estimation for the limited purpose of voting to accept or reject a Chapter 11 plan is governed by FED. R. BANKR. P. 3018(a), which provides "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."[94]  As the U.S. Bankruptcy Court for the District of New Jersey recently observed:

---

[93]  No party objected to the $38,279.22 unsecured claim of the Randall K. Wilde & Nancy R. Wilde Trust, and therefore, the claim is deemed allowed and the corresponding rejecting vote was properly counted in the Class 2 analysis.

[94]  FED. R. BANKR. P. 3018(a).  The Court notes that bankruptcy courts lack the authority to estimate claims for voting purposes if the claims are unliquidated or contingent claims for personal injury or wrongful death.  *See* 28 U.S.C. § 157(b)(2)(B).

> Whereas Section 502(c) mandates that a court estimate a claim when the fixing or liquidation would unduly delay the administration of the case, Rule 3018 permits the court to estimate a claim for purposes of plan voting only. *In re Rock Airport of Pittsburgh, LLC*, No. 09-23155-CMB, 2014 WL 3893359, at *7 (Bankr.W.D.Pa. Aug. 8, 2014). The Bankruptcy Code and Rules do not provide the courts with any guidance about how and when to temporarily allow a claim. *Pension Ben. Guar. Corp. v. Enron Corp.*, No. 04 Civ. 5499(HB), 2004 WL 2434928, at *5 (S.D.N.Y. Nov. 1, 2004). Thus, temporary allowance is left to the discretion of the court. *Id.* *See also In re Frascella Enterprises, Inc.*, 360 B.R. 435, 458 (Bankr. E.D. PA. 2007) (when estimating a claim under Fed. R. Bankr.P. 3018(a), the court looked to the Third Circuit's guidance in *Bittner v. Borne Chemical Company*, 691 F.2d 134 (3d Cir.1982)). There is no particular method to be employed in estimating a claim. *Bittner*, 691 F.2d 135 (acknowledging that estimation decisions are matters best made by the bankruptcy judges "using whatever method is best suited to the particular contingencies at issue"); *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 356 (3d Cir. 2002) (following *Bittner*). Estimation decisions therefore fall within the discretion of the trial judge. *Id.*[95]

The broad discretion standard discussed in *Innovasystems* is supported, in large part, by the word "may" in Rule 3018(a). Although the Tenth Circuit has been silent on this issue, the Bankruptcy Appellate Panel of the Tenth Circuit has employed the same broad discretion regarding claims estimation.[96]

With respect to burdens of proof, the Bankruptcy Appellate Panel of the Tenth Circuit further stated:

> The Bankruptcy Code also offers no guidance on which party has the burden of proof in a Rule 3018(a) estimation proceeding. Some courts have placed the burden of proof on the claimant while

---

[95] *In re Innovasystems, Inc.*, No. 11-36228-ABA, 2014 WL 7235527, at *7 (Bankr. D.N.J. Dec. 18, 2014). *See also In re Armstrong*, 292 B.R. 678, 686 (10th Cir. BAP 2003).

[96] *See Armstrong*, 292 B.R. at 686 ("There is no guidance in the Bankruptcy Code for courts as to how to determine whether to permit the temporary allowance of a claim; it is left to a court's discretion. *See Marin*, 142 B.R. at 379; 9 Collier ¶ 3018.01[5].").

other courts have placed it on the objector. *See, e.g., Zolner*, 173 B.R. at 633-36 (burden of proof is on the claimant); *Stone Hedge*, 191 B.R. at 64-65 (questioning whether burden of proof in a summary proceeding should be on the objector). Because a temporary allowance order only arises if there is an objection to a claim, **we conclude that the burden of proof should be on the claimant to present sufficient evidence that it has a colorable claim capable of temporary evaluation.**[97]

The Court agrees with this conclusion.

Here, the Randall Creditors' request for claims estimation fails. The Randall Creditors never filed a separate motion requesting an estimation of their claims for voting purposes, nor did they file an objection to the treatment of their votes (or the vote of Sue Ann Randall) in the Ballot Summary. Given the uncurbed motions practice exhibited in this case, the Court is baffled as to why the Randall Creditors failed to file a separate pleading requesting claims estimation.

Instead, in response to a question by the Court, counsel for the Randall Creditors argued in her closing that these five claims should be estimated for voting purposes based on a stray sentence contained in their combined response to Experient's Motions to Disallow. The combined response was filed over one year ago and does not even cite to Rule 3018(a):

> This bankruptcy action was filed on 12/9/13, and so the 6-year statute of limitations has not expired from the date of the last written confirmation of these debts on 2/6/2009, until the bankruptcy was filed, and the claims of these creditors should be honored, and their votes should be counted in determining whether the Plan should be confirmed or not.[98]

This single sentence in their Objection filed December 12, 2014, is the only location in the record where the Randall Creditors suggested an estimation of those five claims for voting purposes. Moreover, the combined response

---

[97] *Id.* (emphasis added).

[98] Objection to Motions to Disallow Claims (Docket No. 173), at p.2.

was filed on December 12, 2014 and the evidentiary confirmation hearing commenced on May 29, 2015.  During the period in between, the Randall Creditors had ample opportunity to raise a claims estimation issue, and failed to timely or adequately do so.

Further, even if the Court were to consider the request to estimate those claims, which the Court is not inclined to do, the Randall Creditors did not present any evidence as to the validity and amounts of their claims at the confirmation hearing, with the sole exception of Randall's testimony about his $320,000 judgment now on appeal.  Such testimony is insufficient to meet their burden of proof on claims estimation.

In the absence of any evidence the Court could consider to estimate those five disputed claims, and considering the timing and location of their request, the Court finds the request to estimate claims was insufficiently pled and the claims were not supported with any evidence the Randall Creditors have colorable claims capable of temporary evaluation.  In its discretion, the Court will not allow these claims temporarily for voting purposes, and the Randall Creditors' request to estimate these five claims is denied.

### 3.    *McCarthy Is Not a Statutory or Non-Statutory Insider*

The Randall Creditors' Objection to Confirmation contains several unsupported conclusory allegations McCarthy is an "insider."  However, in her closing argument, counsel for the Randall Creditors conceded McCarthy was not a statutory insider of Experient.[99]  Regardless, the testimony of both

---

[99]  For corporate debtors, the Bankruptcy Code defines the term "insider" as follows:

(I) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor[.]

McCarthy and O'Neil support a conclusion McCarthy is not a statutory insider.[100]

Because McCarthy is not a statutory insider, the Court must address whether he is a non-statutory insider. Courts have developed the concept of a "non-statutory insider"[101] to determine whether a person or entity is an insider, even if its relationship with the debtor is not expressly provided for in § 101(31). According to the United States Court of Appeals for the Tenth Circuit:

> "In ascertaining [non-statutory] insider status, then, courts have looked to the closeness of the relationship between the parties and to whether any transactions between them were conducted at arm's length." *In re Krehl*, 86 F.3d 737, 742 (7th Cir. 1996). A leading treatise supports this view. 5 Allen N. Resnick & Henry J. Sommer, Collier on Bankruptcy, ¶ 547.03[6] (15th rev. ed. 2008) ("The consideration of insider status focuses on two factors: (1) the closeness of the relationship between the parties; and (2) whether the transaction was negotiated at arm's length.").
> . . .
>
> Therefore, for a bankruptcy court to hold that a creditor is a non-statutory insider in circumstances like these, a trustee must prove that the creditor and debtor did not operate at arm's length at the time of the challenged transaction. *See* S.Rep. No. 95-989,

---

§ 101(31)(B).

[100] The evidence established O'Neil is the sole person in control of Experient, including all finances and employment decisions. More importantly, the evidence established McCarthy was at all times an independent contractor hired to develop, update and maintain Experient's software. *See* Exhibit T. McCarthy was never an officer, director, shareholder or person in control of Experient, and McCarthy is not a general partner of Experient or a relative of any general partner, officer, director or any person in control of Experient. Transcript of May 29, 2015, at p.25, lines 11-18; Transcript of June 3, 2015, p.201, lines 4-20.

[101] *See, e.g., Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1276 (10th Cir. 2008); *Farr v. Phase-I Molecular Toxicology, Inc. (In re Phase-I Molecular Toxicology, Inc.)*, 287 B.R. 571, 580 (Bankr. D. N.M. 2002) ("[T]he list of insider relationships contained in 11 U.S.C. § 101(31) is not exhaustive.").

at 25 (1978); H.R.Rep. No. 95-595, at 312 (1977); Resnick & Sommer, *supra*, § 547.03[6].[102]

The Randall Creditors' Objection to Confirmation is silent on the non-statutory insider issue, and they relied entirely on the evidence presented at trial. In essence, the Randall Creditors allege McCarthy is a non-statutory insider because he and O'Neil are old friends, and McCarthy has "control" over Experient's software. The Court disagrees both with their analysis and their conclusion.

Here, the transaction at issue is the proposed APA sale in the Second Amended Plan. The APA was executed on September 25, 2014, after Ms. Lutz prepared her expert report valuing Experient at $0 using four different methods.[103] At that time, Experient had been operating under Chapter 11 for over nine months.

With respect to the control element and the closeness of the relationship between Experient and McCarthy, it is undisputed O'Neil and McCarthy are friends. But this fact alone is not dispositive in this case. The proposed APA sale is not a deal between old buddies. The APA reflects an agreement to retain Experient's business with a seamless transition for its customers (mostly cities and counties in Colorado) through the purchase of a company worth absolutely nothing. While this is the kind of deal only a good friend would consider, it is not a scheme to hurt creditors.

Based on the Court's assessment at trial, the Court believes McCarthy is an honest person. He believes in Experient and in the importance of the software connecting citizens with the police during emergencies. Even after reviewing the Lutz Report, McCarthy recognized the potential for disastrous results for the cities and counties using this software should Experient cease operations. Since 2006 through the Petition Date, McCarthy worked as an independent contractor, and he was paid only twice during that span - a $20,000.00 payment in July 2013, and another $7,000.00 payment in

---

[102] *U.S. Med., Inc.*, 531 F.3d at 1277-80 (citing, *inter alia*, *Rupp v. United Security Bank (In re Kunz)*, 489 F.3d 1072 (10th Cir. 2007)).

[103] *See* Exhibit 5.

August 2013.[104]  As of the Petition Date, less those two payments toward accrued earnings, Experient had incurred a $375,875.00 unsecured debt to McCarthy, not including interest.[105]

McCarthy worked for Experient for over seven years for only $27,000.00   The suggestion he is "getting the company for free" because he is a friend of O'Neil and controls the software is unsupported by the evidence.  There is simply no evidence McCarthy is holding the software hostage.  The Software Contractor Agreement provides the software "is deemed the property of Experient and is confidential and proprietary to Experient, and will be returned to Experient immediately upon request or termination along with any copies."[106]  Therefore, McCarthy cannot take the software with him unless he purchases Experient's assets.

McCarthy testified it may be difficult, but not impossible, for another programmer to understand Experient's partially documented software.  Of course, McCarthy understands the code because he wrote it over seven years, but the suggestion he hijacked the code by ceasing to document the software is a canard.  Rather, the evidence shows the only reason McCarthy fell behind on documenting source code was the time required to address the immediate maintenance demands of customers and the certain aspects of the state court litigation.  Software programmers are not irreplaceable, and under the Randall Creditors' definition, even Hungerford (the defecting programmer) would be a non-statutory insider because he wrote source code with any documentation.

Further, the Court finds all of the questioning from counsel regarding whether McCarthy was offered an ownership interest is irrelevant to this

---

[104]  Transcript of June 3, 2015, p.220, lines 13-24.  The Court also notes that trial in the state court action was held sometime in October 2013.  Thus, the payments to McCarthy were made two and three months before the state court trial, not "on the eve" of trial as alleged.

[105]  Counsel for the Randall Creditors unsuccessfully attempted to challenge the validity of this claim during questioning, and no objection was filed to McCarthy's unsecured claim, so by operation of § 502(a), McCarthy's claim is deemed an "allowed" claim.  Further, McCarthy testified he had received a grand total of $7,000.00 for post-petition services from the Petition Date through trial.

[106]  Exhibit T, at p.2, ¶ 8.

issue.[107] McCarthy never held an ownership interest in Experient or had any actual control over Experient or its finances. Although McCarthy entered into a software license agreement prior to the Petition Date, the agreement only allows McCarthy to use and maintain the software for Experient. A license agreement does not confer any ownership interest. Even Randall admitted McCarthy was involved with Experient "[o]nly in respect to writing the program."[108] For all of these reasons, the Court finds McCarthy does not control Experient, even though he is the current lead programmer.

In reality, McCarthy has two choices here, either proceed under the APA or simply walk away and keep his $50,000.00 cash and the his unsecured claim. The Court finds no concern with the APA on the facts of this case. McCarthy and Experient share a business relationship, but not the kind of relationship typical of a non-statutory insider.

In addition, the structure of the proposed APA sale does not lend to the conclusion the APA was not negotiated at arm's length. An arm's length transaction is one made "in good faith in the ordinary course of business by parties with independent interests. [It is that] standard under which unrelated parties, each acting in his or her own best interest, would carry out a particular transaction."[109] Again, we start with the fact Experient has no value. McCarthy agreed to purchase Experient for $50,000.00 and a complete waiver of his $375,875.00 claim for accrued earnings "to keep the company going on the other side."[110] McCarthy concluded his $50,000.00 price was fair and reasonable because "if I have to rewrite the code, I know

---

[107] Much of Ms. Secor's confusion on this issue was caused by the original payment provision in the Software Contractor Agreement. For the first upgrade from software version one to version two, McCarthy was supposed to receive $25,000.00 and "[t]wo and one half percent (2.5%) of Experient stock to be issued upon request but no later than December 31st, 2008." *See* Exhibit T, p.4, ¶ III.b. McCarthy would then be paid $1,000 per month for the subsequent upgrade from version two to a new major or minor revision. *Id.* at p.5, ¶ II.a. The point - the evidence established none of these "payments" were made and no stock was issued in favor of McCarthy, rather, McCarthy continued to work for nothing until receiving $27,000.00 in July and August 2013.

[108] Transcript of June 3, 2015, p.289, lines 20-22.

[109] *Id.* at 1277 n.4 (quotation omitted).

[110] Transcript of June 3, 2015, p.209, lines 4-17.

that it will cost about--you know, about $50,000 of my time to do that, so, you know, that's what I'm willing to pay."[111]

In addition, McCarthy's purchase price is the only offer on the table, and no higher or better offers were received by Experient during the pendency of this bankruptcy case.  As further evidence of good faith, McCarthy took a second mortgage on his personal residence to fund his $50,000.00 cash payment in this deal.[112]  This is not the kind of risk an individual incurs as part of a conspiracy to help Experient avoid paying its creditors.  McCarthy wants to keep the business alive, but he also wants to get paid for all his hard work.  There is no malevolent motive here.  For these reasons, the Court finds the proposed APA sale in the Second Amended Plan was negotiated at arm's length after obtaining a neutral valuation of Experient.

Accordingly, the Court concludes McCarthy is not a non-statutory insider of Experient.

### 4.    *Section 1129(a)(3) - Good Faith*

Section 1129(a)(3) provides a Chapter 11 plan must be "proposed in good faith and not by any means forbidden by law."[113]  While the Bankruptcy Code does not define "good faith," the United States Court of Appeals for the Tenth Circuit articulated the following standard:

> The test of good faith is met if there is a reasonable likelihood that the plan will achieve its intended results which are consistent with the purposes of the Bankruptcy Code, that is, is the plan feasible, practical, and would it enable the company to continue its business and pay its debts in accordance with the plan provisions.[114]

---

[111]  Transcript of June 3, 2015, p.213, lines 17-25.

[112]  Transcript of June 3, 2015, p.209, lines 18-24.

[113]  § 1129(a)(3).

[114]  *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456 (10th Cir. 1985).

The § 1129(a)(3) good faith test "focuses on whether a plan is likely to achieve its goals and whether those goals are consistent with the Code's purposes."[115]

Here, the Court starts with an important point: Experient requested an examiner to review Experient's dealings with O'Neil, and as a result of the Examiner's Report, O'Neil will receive nothing under the Second Amended Plan. Experient has been transparent in this case, and followed the recommendations of Connolly in crafting the Second Amended Plan. At the end of the day, O'Neil walks away with nothing under the proposed plan. Further, Experient is not transferring any legal claims to McCarthy under the APA. Rather, Experient is turning all of those claims over to the Plan Trustee to pursue at his discretion. None of these actions are indicative of bad faith.

The Randall Creditors assert the Second Amended Plan was not proposed in good faith because:

Here, the Debtor's Plan is essentially gifting all of the Debtor's assets to Mr. McCarthy for $50,000. The Plan creates Mr. O'Neil as an impaired creditor so that Mr. O'Neil may vote on the Plan and the Debtor can meet the requirements of §1129(b). Yet, it would be improper to permit O'Neil or McCarthy to vote on the Plan.

. . .

The Debtor (and Mr. O'Neil's) ulterior motive by the Plan is to strip the Debtor of its assets and deprive the Creditors of the returns that can be realized from the Debtor's assets over time. . . . As noted by the Examiner, a Chapter 11 Plan should be based upon the assumption that Mr. O'Neil's secured claim should be set aside. *See* Docket No. 121, p. 8. Indeed, once Mr. O'Neil's claims are stripped out of the Debtor's liabilities, a Chapter 11 Plan can balance the enterprise value going forward. *Id.* Clearly, the Debtor has not proposed its Plan in good faith and should be denied.[116]

---

[115]   *In re Paige*, 685 F.3d 1160, 1179 (10th Cir. 2012) (reaffirming the standard set forth in *In re Pikes Peak Water Co.*).

[116]   *See* Objection to Confirmation, at p.8-9, ¶ 55-65.

Their conclusion is not so clear to this Court, particularly in the absence of any evidence supporting these arguments.

Experient is not "gifting" anything to McCarthy. Rather, McCarthy is purchasing certain assets from Experient for $50,000.00 and a waiver of his unsecured claim, with all cash, accounts receivable, avoidance and other legal claims transferring to a Plan Trustee to administer. Further, neither McCarthy nor O'Neil were entitled to vote on the Second Amended Plan. In any event, the Randall Creditors were unable to support these allegations with any evidence at the confirmation hearing.

Moreover, O'Neil openly testified the reason Experient filed for bankruptcy relief was Randall's $320,000.00 state court judgment.[117] However, this alone is not indicative of bad faith. The unsecured creditors class consists of allowed claims totaling over $200,000.00, excluding the claims of the Randall Creditors. To the extent the Randall Creditors claims are allowed, including Randall's $320,000.00 disputed unsecured claim, the Randall Creditors will receive the same treatment as all the other unsecured creditors, and cannot be considered a "target" of the Second Amended Plan.

Filing bankruptcy on the heels of an adverse judgment is not atypical, and the Randall Creditors did not present any evidence to rebut the testimony of O'Neil, or any evidence of conflicts of interest or unethical conduct. Rather, the evidence established McCarthy's offer under the APA was the only offer received by Experient. Both Randall and Bateman testified they had an opportunity to offer a higher and better bid than McCarthy's offer, but they declined to do so. No other outside offers were received.

Therefore, based on the record, the Court finds there is a reasonable likelihood the Second Amended Plan will achieve its intended results consistent with the purposes of the Bankruptcy Code. The Second Amended Plan is feasible, practical, and would enable Experient with its only opportunity to pay its debts in accordance with provisions of the Second Amended Plan. Accordingly, based on the totality of the circumstances, the Court finds Experient proposed the Second Amended Plan in good faith and the requirements of § 1129(a)(3) are satisfied.

---

[117] Transcript of May 29, 2015, p. 25, lines 19-21.

5.    *Section 1129(a)(7) - Best Interest of Creditors*

"Section 1129(a)(7) requires that the plan either be accepted by each impaired class, or provide that each non-accepting member receive at least as much as they would in a chapter 7 liquidation."[118]  As set forth above, the only impaired class entitled to vote (Class 2) accepted the Second Amended Plan.  Thus, § 1129(a)(7) is satisfied on that basis alone.

However, as independent grounds for satisfaction of § 1129(a)(7), Experient also established Class 2 unsecured creditors would receive more under the Second Amended Plan than in a hypothetical Chapter 7 liquidation.  There are no secured creditors in this case, and the only distribution under the Second Amended Plan would be to unsecured creditors.  The Second Amended Plan provides for a *pro rata* distribution to unsecured creditors of approximately $112,000.  This includes the $50,000.00 generated from the sale of Experient's Purchased Assets under the APA.

In this Chapter 11 case, the allowed unsecured claims total $201,064.25, excluding the unsecured claims of the Randall Creditors and Sue Ann Randall.  Even if the Randall Creditors and Sue Ann Randall prevail in their claims litigation, the total amount of unsecured claims would only increase.  Thus, the $112,000.00 estimated distribution is insufficient to pay Class 2 creditors in full, and no distribution would be made on account of an holders of equity interests in Class 4.  In addition, the Second Amended Plan provides for McCarthy's waiver of his unsecured claim, but the waiver is contingent on confirmation of the Second Amended Plan and closing under the APA.

The outcome for unsecured creditors holding allowed claims is much less if the case were a case under Chapter 7.  Experient would cease operations, McCarthy's unsecured claim would be added to the calculation of total allowed unsecured claims, and the extra $50,000.00 from the sale of the Purchased Assets would be lost.  This means in a Chapter 7, the unsecured creditors would lose $50,000.00 off the top, leaving only $72,000.00 available for distribution.  Simultaneously, the total dollar amount of allowed unsecured claims would more than double as a result of

---

[118]  *In re Paige*, 439 B.R. 786, 797 (D. Utah 2010) *aff'd,* 685 F.3d 1160 (10th Cir. 2012) (citing § 1129(a)(7)).

McCarthy retaining his unsecured claim ($201,064.25 + $375,875.00 = $576,939.25).  The arithmetic is clear:  the best interest of all creditors is served if the Second Amended Plan is confirmed because they will receive a much higher distribution.

The Randall Creditors' opposition under § 1129(a)(7) is based on the false premise Experient would continue to operate as a going concern if the Second Amended Plan is not confirmed.  There are two fundamental problems with their position.  First, the approved Stipulation between Experient and the UST requires Experient to convert this case to Chapter 7 in the event the Second Amended Plan is not confirmed, so the Second Amended Plan is Experient's one and only chance under Chapter 11.  Experient would stop operating in a Chapter 7 scenario, unless a Chapter 7 trustee chose to operate the business, pay employees and contractors, and spend the estimated $350,000.00 to document the partially documented software with the hopes Experient could be sold down the line at a profit.  This is highly unlikely.  Second, Bateman testified Experient could afford to repay creditors if it stopped paying its employees.[119]  "In all of my business experience, anybody that gives me money to start a business should be at the head of the line. After they've been paid, then I can make all the money that's there. But morally, I think that you owe the people that put you there in the first place."[120]  That could be true assuming the employees continued to work each day without pay until all the creditors are paid in full.  However, indentured servitude is an antiquated practice, and illegal in the United States.[121]

---

[119]  Bateman stated:

I'm not an accountant, but I do understand some of how books go. You have sales; you have income, and that usually is called gross incomes. Then you have expenses that are directly involved with that. In this case, it would be like hardware that you have to take out, and then that's your--your gross revenue. And then you have all your expenses that--salaries and rent and utilities and all of  that, before you get to the bottom line of net profit at the end. And in my looking at the books, there was sufficient net profits if you removed the salaries that, in my opinion, were overstated.

Transcript of June 3, 2015, p.261, lines 19-25 through 262, line 1-5.

[120]  Transcript of June 3, 2015, p.266, lines 6-10.

[121]  U.S. CONST. amend. XIII, § 1.

For these reasons, the Court finds Experient has established the Second Amended Plan is in the best interest of creditors pursuant to § 1129(a)(7).

6. *Section 1129(a)(8) and Section 1129(b) - Fair and Equitable Test and the Absolute Priority Rule*

In order for a plan to be confirmed, § 1129(a)(8) requires, with respect to each class of claims or interests, (A) such class has accepted the plan; or (B) such class is not impaired under the plan.[122]  Here, there are no secured creditors, and the only class entitled to vote, Class 2, voted to accept the Second Amended Plan.  Thus, § 1129(a)(8) is satisfied.

The Randall Creditors argue the Second Amended Plan unfairly discriminates between classes in violation of the fair and equitable test, and violates the absolute priority rule.  "Pure applesauce."[123]

The "fair and equitable" test in § 1129(b) is an exception in circumstances when an impaired class does not accept the plan, allowing a court to "confirm the plan notwithstanding [§ 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class . . . that is impaired under, and has not accepted, the plan."[124]  Under § 1129(b)(2)(B), the fair and equitable provision also includes the absolute priority rule:

> The Code explains that "the condition that a plan be fair and equitable with respect to a class includes" the requirement that "[w]ith respect to a class of interests . . . the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."  §§ 1129(b)(2), 1129(b)(2)(C)(ii).  This requirement, known as the absolute priority rule, "requires that certain classes of claimants be paid in full before any member of a subordinate class is paid."  *See*

---

[122]  § 1129(a)(8).

[123]  *King v. Burwell*, 135 S. Ct. 2480, 2501 (2015) (Scalia, J., dissenting) ("pure applesauce" is commonly interpreted to mean nonsense).

[124]  *Paige*, 685 F.3d at 1183 (quoting § 1129(b)(1)).

*Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002).[125]

In its simplest terms, the absolute priority rule requires creditors to be paid in full before any lower priority participant, such as an equity holder, may share in the assets of the reorganized entity.[126]

Here, the exception does not apply because an impaired class voted in favor of confirmation.  Moreover, even if the absolute priority rule somehow applied, there is no violation.  Class 4 equity holders are a lower priority than Class 2 unsecured creditors.  Under the terms of the Second Amended Plan, Class 4 is receiving nothing under the Second Amended Plan unless all allowed unsecured claims are paid in full.  As set forth above, the Net Proceeds are insufficient to pay Class 2 in full, and Class 4 will receive nothing.

Accordingly, the Court concludes the Second Amended Plan complies with § 1129(a)(8), and even if it did not, the Second Amended Plan does not discriminate unfairly in that all similar claims are treated the same and the absolute priority rule is satisfied in light of Class 4.

> 7.    *Section 1129(a)(11) - Subsequent Reorganization*

Feasibility of a Chapter 11 plan is a question of fact, and Experient bears the burden to show feasibility by a preponderance of the evidence.[127]

Feasibility is the shorthand term for the requirement of confirmation as set forth in § 1129(a)(11); it imposes a requirement that any plan must provide a realistic and workable framework for reorganization.  A plan is considered feasible where it is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to

---

[125]  *Id.*

[126]  *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202 (1988).

[127]  *In re Inv. Co. of the Southwest, Inc.*, 341 B.R. 298, 310 (10th Cir. BAP 2006).

the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[128]

Here, the Second Amended Plan is a liquidating plan, and there will be no need for further reorganization following confirmation of the Second Amended Plan and closing on the APA. Further, McCarthy testified to his willingness to close under the APA, and stated he has the $50,000.00 cash needed to close for obtaining a second mortgage on his home.

The evidence before the Court shows the APA and the Second Amended Plan provide a workable framework to transition ownership while providing funds for distribution by the Plan Trustee following closing. Experient, assuming the *status quo*, will consummate the APA closing within the time frame provided for under the APA and the Second Amended Plan. Therefore, the Court finds this requirement has been satisfied, and the Second Amended Plan is feasible.

## CONCLUSION

Like Captain Ahab, the Randall Creditors have been obsessed with pursuing Experient into oblivion. Despite the pedestrian nature of the liquidating Second Amended Plan, the Randall Creditors have attempted to rehash portions of Randall's ongoing state court litigation, eliciting irrelevant testimony regarding events occurring over a decade ago, and highlighting the findings set forth in the Examiner's Report in a vacuum without considering the impact and role of the proposed liquidating plan trustee. Even worse, the Randall Creditors take the untenable position the Second Amended Plan should be denied and Experient should be compelled to stay in business as a going concern by foregoing payment of employee salaries until Experient generates sufficient revenue to repay all creditors in full. To phrase it plainly, the Court is unpersuaded by each of their objections to confirmation, and much like the fate of Captain Ahab, the objections to confirmation raised here are destined for the bottom of the deep blue sea.

Accordingly, the Court finds the Second Amended Plan is confirmable over the Randall Creditors' objections. The Court

---

[128] *Id.* at 310-11.

ORDERS the Randall Creditors' Objection to Confirmation (Docket No. 254) of Experient's Second Amended Plan is OVERRULED.  No other objections remain to confirmation of the Second Amended Plan of Reorganization as amended by the Errata to the Debtor's Second Amended Plan.

THE COURT FURTHER ORDERS the Debtor's Second Amended Plan of Reorganization is hereby CONFIRMED.  Experient shall provide a proposed confirmation order to chambers for the Second Amended Plan of Reorganization (Docket No. 226) as amended by the Errata to the Debtor's Second Amended Plan (Docket No. 255) within seven (7) days from the date of this Order.  The Court

FURTHER ORDERS the pleadings filed after the close of evidence at trial, including the Randall Creditors' Motion to Set Aside Order Approving Stipulation (Docket No. 298), Experient's Motion to Strike the Motion to Set Aside (Docket No. 300), the Randall Creditors' Motion for Leave to File Alternative Chapter 11 Plan of Reorganization (Docket No. 301), the Randall Creditor's Response to Motion to Strike (Docket No. 303), and the Randall Creditors' Motion to Appoint a Chapter 11 Trustee (Docket No. 305), are all DENIED AS MOOT as a result of confirmation of the Second Amended Plan.

Dated August 12, 2015                    BY THE COURT:

Michael E. Romero, Chief Judge
United States Bankruptcy Court